## Thompson et al. v. Commonwealth.

(Decided June 3, 1938.)

D. HOLLENDER HALL and B. M. JAMES for appellants.

HUBERT MEREDITH, Attorney General, and GUY H. HERD-MAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At about 3 p. m. on Sunday, June 27, 1937, the appellants, Marion and Phil Thompson, brothers, in Floyd county, Kentucky, shot and killed with pistols Frank Meadows—the latter being then 19 years and 8 months old; while Marion Thompson was then 22 years of age, but the record does not disclose the age of his brother, Phil. At the September, 1937, term of the Floyd circuit court appellants were indicted, charged with murder, and were later tried when they were convicted of voluntary manslaughter and punished by confinement in the penitentiary for 21 years each. The court sustained their joint motion for a new trial. At the following January, 1938, term of the court they were again tried and a like verdict was returned, except the punishment was then fixed at 7 years confinement in prison for each of them. Their motion for a new trial following that verdict was overruled, and from that

order, and the judgment pronounced on the verdict they prosecute this appeal, urging through their counsel only two grounds for a reversal of the judgment, which are: (1) That the testimony of the commonwealth was insufficient to submit the case to the jury, and their motion for a directed acquittal should have been sustained, or if mistaken in that, then the verdict is flagrantly against the evidence, and (2) prejudicial remarks of prosecuting attorney made in his argument to the jury.

The place of the shooting was at a point on Sowders Creek road (which practically parallels the creek) where another road leads from it at right angles and extends over into a neighborhood called "Buffalo." There had been religious services at a church near the mouth of Sowders Creek on that morning and the deceased, Meadows, attended the services, as did also appellants, who resided in the same neighborhood of the deceased about one mile higher up Sowders Creek. After the services closed at the church a number of young people left and started up the road towards the home of appellants, as well as that of the deceased, but they stopped and tarried at the residences of other citizens along the route arriving eventually at the point where the shooting occurred. In the front crowd or bunch of travelers were appellants and three or four others, including some girls, and they sat down on rocks, stumps or logs at the point where Buffalo road ran into Sowders Creek road and were sitting and talking when Bernie Ward and deceased soon arrived traveling in the same direction that the others had. Ward stopped and joined the crowd of which appellants were members, but deceased continued up the road some half a mile or more to the residence of his father where he also resided. He exchanged shoes on arriving at his father's house, and procured a shotgun loaded with squirrel shot and returned to the place where he left appellants and their crowd, carrying his shotgun which the proof shows he frequently used in hunting. There had been bad feelings engendered between the Thompson brothers on the one side and the deceased, growing out of a rivalry over the attentions, and possibly the affections of a young lady witness, and who also was present and saw the shooting. But, before the trial she married a nephew of the deceased and was Mrs. Meadows at the date of the trial. Appellants admitted

the existence of the bad feelings, and the occurrences of a near encounter some short while before the killing between Meadows and defendants and that they ceased speaking to him thereafter.

On the day of the killing Marion Thompson equipped himself with a .45 calibre Colt pistol before going to church, and his brother, Phil, did likewise, except his pistol (of the same make) was only of .32 calibre in size. There was testimony (although denied by defendants and some others) that each of them was drinking, and there is positive and uncontradicted testimony that deceased was more or less intoxicated and had been drinking during the day, for some time prior to the shooting. There is great contrariety in the testimony as to what happened when deceased returned to the scene after procuring his shotgun. There was, however, uncontradicted testimony that on his way from the church, and a short while before he procured the gun, he stated to his immediate traveling companion, Bernie Ward, that he would like to talk to the Thompson boys and ascertain from them the cause of their aloofness towards him, and to, in substance, patch up the difficulty. Defendants and three or four others testified that when deceased got within some 30 or 35 feet of the crowd upon returning with his shotgun the appellants backed away through a paling gate across the Sowders Creek road at that point and started down the road in the direction from whence they came. When a short distance after they passed through the gate deceased raised his gun—not to the shoulder, but elevated it in his hands—and shot in the direction of appellants and that he repeated the shooting for the second or possibly the third time. Three witnesses, testifying for the commonwealth, stated that deceased did not fire the first shot but that the beginning of the shooting was by appellants with their pistols pointed at deceased. At any rate no harm was done by that first skirmish. Immediately following it (regardless of who began it) deceased started traveling at right angles to the Sowders Creek road in and upon the Buffalo road.

In the right angle formed by the junction of the two roads there appears to have been a small hill or mound, and the parties could not get a view of each other until each of them got some distance on the respective roads that they were traveling from the point

where the first shooting occurred, which, as we have said, is where the roads intersect. When appellants had gone down the Sowders Creek road far enough to see around the mound or elevation and deceased had gotten far enough on the Buffalo road to enable them to see him, they began shooting at him again, and he at them. The preponderance of the testimony indicates that the shooting at that time was begun by appellants. Two or three more shots were fired by deceased until he got close to, if not upon, the bridge across Sowders Creek which formed a part of the Buffalo road, which point is 106 feet from where it intersects with the Sowders Creek road, thus showing that he had traveled that distance from the place of the first skirmish. Likewise, appellants had traveled 185 feet from the same point down Sowders creek road—making a hypotenuse, a distance of some 227 feet between the combatants at the time deceased was wounded, from the effects of which he died three days thereafter, without ever regaining consciousness. He was hit by two bullets, and the only witness who located them was his father who, when asked where his son was wounded, said: "In the left shoulder, and one shot in the left corner of the mouth." The location of the wounds on the body corroborates beyond dispute the testimony of the commonwealth's witnesses who said that when deceased was shot by appellants he was going away from them with his left side turned toward them, and that he then had his gun in his hand by his side, making no demonstrations to shoot it.

Among the witnesses for the commonwealth who testified that appellants began the shooting, without deceased making any hostile demonstrations, was Troy Compton, whose father lived on the hill just across the bridge on the opposite side of the creek from where deceased was shot. She was 9 years old and thoroughly qualified herself on her voir dire examination. In telling how the difficulty commenced and how it terminated, she said: "He (deceased) come down the road to where these boys was and they commenced shooting at him, shot about three times and Frank throwed up his gun and I heard it go off and they went on down the road shooting back at him and Marion went down there and put his pistol up on a post and shot him and Phil walked down the road and shot back about three times."

At least two other witnesses corroborated, in substance, the testimony of that youthful and intelligent witness. A physical fact, testified to by all the witnesses and denied by none, also corroborates that theory of the case, and which is, that although the gate across Sowders Creek road and through and beyond which appellants retreated before any shooting began, was closed at the beginning of the shooting, no shot was found in any of its palings, although other witnesses testified that some empty as well as loaded shot gun shells were found near the junction of the two roads. It was also proven and undenied that from the time deceased approached with his shotgun appellants drew their pistols and each of them had his weapon in his hands behind him at the beginning of their retreat and until they commenced shooting at deceased. Therefore, if the testimony of the commonwealth's witnesses to the effect that deceased began the shooting by first firing his shotgun be accepted as true, it might well be surmised that he was induced to do so by the actions of defendants in drawing their weapons and assuming a hostile attitude towards him when at the same time he intended neither of them any harm upon his return trip from his father's house with the gun.

But be that as it may—and conceding arguendo that deceased wrongfully began the shooting—it was testified to by practically all the witnesses that at the immediate time when he was shot he had ceased shooting at defendants and was traveling away from them with his side to them and his gun by his side with him making no further hostile demonstration. Also it was proven that in firing the final and fatal shot at deceased each of the appellants took aim and both prosecuting and defense witnesses testified that Marion Thompson rested his .45 calibre pistol in firing the last shots on top of a post, and that his brother fired his pistol with its barrel against the side of the same post—thus enabling each of them to shoot with accuracy and it is conclusively shown that it was those last shots that took effect and produced the decedent's death. Of course, the testimony took a much wider range than we have covered in our brief but substantial narration of its material parts. The testimony for both sides related to occurrences happening on the fatal day prior to the occasion of the killing; but the most of it was directed to the drinking of liquor by the immediate

parties to the difficulty and, perhaps, by their associates also and to a narration of the places they visited and the length of time they stayed, etc., but none of which bare materially upon the issue of responsibility for the homicide, or who began the immediate difficulty or whether or not the shooting by appellants was, as they claim, made necessary in their self-defense and the defense of each other. Our narration of what occurred at the immediate time demonstrates conclusively that it was essentially a question for the jury to determine whether or not the killing of deceased was made necessary on the part of appellants for the protection of themselves from threatened harm at his hands.

There was abundant proof to sustain the theory, either that appellants began the battle that terminated in the tragic death of deceased; or if not so, then there was almost uncontradicted testimony that they shot and killed him *at a time* when he had abandoned the difficulty that he had commenced—according to their testimony—and that neither of them was then in any immediate danger of loss of life or bodily harm at his hands, or that he was then threatening to inflict any such danger. On the contrary, it was shown that he had started across the bridge in a non-hostile attitude and traveling away from them. It is, therefore, apparent that ground (1) argued for a reversal of the judgment can not be sustained.

In support of ground (2) a number of isolated sentences, taken from prosecuting counsel's argument to the jury, are contained in the bill of exceptions—one of which was that Marion Thompson had testified that during the melee, and at about its close (perhaps from the last shot made by deceased) 28 small shot entered his body, which, of course, had to pass through his clothing before reaching his body, and which, if true, demonstrated the most excellent quality of the gun with which deceased did the shooting, since at that time he was 227 feet away from appellants and the shot from his gun was then traveling on a level with sufficient force to penetrate the clothing and to enter the body of Marion Thompson. He had so testified but exhibited no scars, nor any of the shots that he claims so wounded him, though he stated that he picked them out of his body after the battle was over. Neither did he exhibit any of his clothing to fortify his statement, al-

though he stated that the same garments had been preserved and were at his home at the time he testified. Counsel also commented on the testimony of witnesses stating that appellants rested their pistols on the post when they fired the fatal shot. Other remarks of counsel of equal immateriality—and none of which transgressed the proper license of attorneys in presenting their theory of the case—are contained in the bill of exceptions, which demonstrate the utter absence of foundation for this ground, and which counsel in brief but lightly refer to and cite no case in point. They do call our attention to cases wherein we held that the argument of counsel was prejudicial because plainly exceeding the proper limitations of legitimate argument; but because we so ruled in those cases furnishes no ground whatever to do likewise in this one when dealing with an argument that is altogether proper and within the permissible authority of counsel to make, as well as within his duty as a prosecuting officer.

We find no error in the record whereby the rights of defendants to a fair trial, were in any manner prejudiced, and for which reason the judgment is affirmed.